Good morning. My name is Sarah Tallman. I'll be arguing on behalf of petitioners. I'd like to reserve about four minutes for rebuttal. EPA's framework rules violate TSCA because they allow the agency to determine that a chemical is safe while ignoring many of the prioritization and risk evaluation processes violates Congress's express mandate to protect vulnerable groups like children, workers, and the elderly from harmful chemical exposures. Congress recognized that these groups are often harmed by even low levels of exposure to chemicals, and they're often exposed to chemicals through many sources. For example, even the smallest amount of lead is harmful to kids, and kids are exposed to lead through many different sources, including drinking water, contaminated dust, and lead paint. Counsel, if I might suggest, you received the order indicating that we have some interest in the question of jurisdiction in this case, and I would appreciate your thoughts on that. Do your clients have standing, and is this within the Article III jurisdiction? Yes. Petitioners have standing to bring this case, and it's ripe for review now. Petitioners meet the test for standing set forth by this Court on remand from the Spokio case because we have shown that one, EPA's rules violate statutory requirements that were established to protect public health from harmful chemicals, and two, petitioners submitted unrebutted evidence showing that these specific violations present a material risk of harm to petitioners' concrete interest in avoiding exposure to harmful chemicals. These injuries are concrete and not conjectural. EPA has already started evaluating chemicals to which our members are exposed, for example, asbestos, 1,4-dioxane, and a flame retardant known as HBCD, and EPA is using the unlawful procedures in the framework rules. Could you challenge those particular chemical evaluations, though, and challenge the application of these rules in that context? We could, but that does not defeat the fact that we have standing to challenge the rules themselves, and in fact, Congress specifically authorized immediate review of these rules through Section 2618A1A of TSCA, so Congress anticipated and wanted immediate review of these framework rules, and we have shown that the rules present a material risk of harm to the concrete interest that Congress intended to protect by establishing these requirements in TSCA and compelling EPA to promulgate rules that comply with those requirements. I'm interested in whether the rules as such constitute the threat of harm or whether it's the chemical companies or the chemicals themselves that create the risk. Well, I think the rules present a material risk of harm to our clients' concrete interest because Congress established specific procedural requirements, and those requirements are for the agency to evaluate chemicals through a multi-step process and then implement regulations to address unreasonable risks for those chemicals. That entire regulatory regime is promulgated for the purpose of protecting public health from harmful chemical exposures, and so we have shown a direct connection between EPA's unlawful implementation of the statute and our concrete interest in avoiding harmful chemical exposures. But as I understand the process here, the actual designation of categories and the specific regulations with respect to specific chemicals are really far down the line, years out. Well, there are multiple stages in the causal chain, but that does not, again, defeat that we have standing because we have connected each of those links through reasonable probability. It is certain that EPA will conduct risk evaluations of specific chemicals, Congress required them to, and those evaluations must follow specific procedural requirements. We have shown that our members are exposed specifically to chemicals that EPA is already evaluating, and that our exposures are from the kinds of circumstances that EPA is ignoring in its evaluation. I think the asbestos evaluation is a good example of this. Our petitioner, United Steelworkers, has members that are exposed to asbestos through their work, through the kind of so-called legacy uses that EPA is completely ignoring. We have submitted expert evidence that these kinds of exposures are harmful, and so it's decision-making will be under-protective and under-inclusive, and that is the risk of harm. But what exactly is the procedural injury at this time? So the procedural injury is the fact that Congress required specific procedures for EPA to follow, and EPA's framework rules contravene those procedures or deny what Congress required. And it's at this framework level, but that doesn't defeat the fact that it is, in essence, a procedural injury. It's the denial of requirements that govern the process that EPA is supposed to use when it evaluates each chemical. But usually in these procedural standing cases, there's a procedure that is designed to immediately protect the people who have the interest, and here it's like two steps, right? So it's a little bit confusing whether we're in the same posture as the cases that talk about procedural standing. I think it is a little bit different than the direct application of, you know, failure to do notice and comment, but it's almost as if the agency issued a rule that said we're never going to do notice and comment, or we're only going to do notice and comment sometimes. The thing that I'm struggling with, and I think maybe you started to talk about the legacy issue, which I do wonder whether the legacy issue is slightly different than some of the other issues in regard to the question I'm about to ask, which is some of these rules seem to be a little bit vague, so we don't really know what the agency is going to do. It seems like maybe the legacy one is different, and so for the ones that may be vague, we may learn more in the particular application of them. In the legacy ones, though, I'm not sure there ever will be a particular application because if they just stop once they determine something is a legacy chemical, we may never get an evaluation of that chemical. Am I understanding that correctly? So there's two different steps in the process. So in the prioritization stage, yes, EPA could exclude consideration of these so-called legacy uses and then determine that that chemical is not really warrant, doesn't warrant a risk evaluation, and it would then designate that chemical as what's called low priority. Is that what they would do? That's what I'm wondering. So if they think something is legacy, would they call it low priority, or would they just not call it anything because they think it's out of this process altogether? So I think my understanding of what EPA is saying is that these legacy uses do not fall within the statutory definition of conditions of use, and therefore the agency is saying we don't have to look at those. We can ignore them when we're evaluating the question that Congress asked us, does a chemical, say asbestos, pose an unreasonable risk to public health, including vulnerable subpopulations like workers? But so would they say that a legacy chemical was a low priority chemical, or would they not call it that? Well, I think the particular uses of the chemical, EPA is saying, the idea of what EPA labels as legacy activities is really divided into three subcategories. So there's something called associated disposal, which is actually the future disposal of a chemical. Legacy use, which EPA says is an in-situ use of a chemical, so asbestos that's sitting in a building, it's still being used, but EPA says we don't want to think about that because the asbestos is no longer being manufactured for that use. And then what EPA calls legacy disposal, which is chemicals that are substances that have already been placed in a waste facility. So there are different uses that EPA puts that legacy label on, but the chemical itself is not being labeled legacy or not legacy, to my knowledge. So there would be a chance to review the categorization of that chemical later? Yes, and I think there is judicial review at various stages in this process of EPA's implementing decisions, but that does not defeat standing here to challenge these rules on their face, especially when Congress specifically authorized immediate review, and that's through section 2618. So what do we do if when we read these framework regulations, we can't really tell what they mean? Well, I think we can tell what EPA has authorized itself to do. So it has answered some legal and statutory interpretation questions, and there's no more need for factual development to... Except if what they're saying is we may do this. Until we know whether they will, how do we know that your clients are injured? Well, they have already done the will. But we don't have that in our record, right? Like what they're actually doing with these particular chemicals and whether they're actually ignoring things is not what we have before us now. So that's why I don't understand how we review this. It seems like maybe we need to wait to see, are they actually ignoring all these things and then deal with it then? So the court can consider extra record evidence for purposes of jurisdiction. And so it can consider, for example, the scoping documents that we submitted as part of our motion appendix. And that specific evidence shows that EPA is already exercising its unlawful assertion of authority under these rules. And so it is clear that it has already done the will. It's not just may, it's will. They have started exercising this authority in the legacy context. There's no question they're doing that for every risk evaluation and every prioritization decision, because they've already made a finding that these kinds of activities don't count as conditions of use. So for that issue, there's absolutely no question that that's what they're going to do every single time. For the other issues, again, EPA has said this statute authorizes us, for example, to ignore activities that even activities that EPA says, yes, these fall within the conditions of use definition. EPA says we have authority to ignore them. And it's already started doing that. And we've submitted evidence of that, for example, in the 1-4 dioxane risk evaluation. And that's at MA motion appendix 170, where they said we're going to ignore this condition of use. So we have submitted substantial evidence that they are doing this. And the legal question of whether they have authority to do it is squarely before the court. And Congress anticipated that this court would have jurisdiction to review those legal questions. Even if EPA hasn't decided specifically which uses they may or may not ignore in any given risk evaluation, the threshold statutory question of whether they have authority to ignore any uses has been finally determined by the agency. The agency says, yes, we have authority to do that. Petitioner's position is that Congress said no, you do not have authority to do that. And that legal question is squarely before the court. So the thing that's troubling is we don't have, like, normal briefing on these applications that you say, I mean, you may be absolutely right that they are ignoring things in these I mean, we as a court, I'm not quite sure how we're supposed to evaluate whether you're right about that. If it would be helpful to have supplemental briefing, further briefing on the standing issues in this case, petitioners would be happy to submit that briefing after argument if that would be helpful to the court. I think there is evidence in the record. And I have a list of sites if that would be helpful now for each of the issues that shows that there's a reasonable probability that or a material risk of harm to our concrete interests. And that is sufficient to show standing under this court's precedence in the Spokio case and in the long line of other cases. Are those those sites going to be about these reviews of particular chemicals, the things that are in the appendix? They're about both things. So they're about ways in which EPA is already implementing these unlawful procedures. There's expert evidence about the connection between if EPA ignores things, if it doesn't do a comprehensive risk evaluation, that means that these that its decision making will be under inclusive and under protective. There's evidence that our petitioners are being exposed to various chemicals that are currently under evaluation. So we have submitted robust evidence showing that we have met the concrete interest and have shown an injury. In fact, Why wouldn't it be more appropriate, though, to challenge EPA's exercise of its discretion as applied to an individual risk evaluation? That would cause significant undue hardship to petitioners by delaying for years potential health protections to which they are entitled under the statute. It doesn't make very case that you're bringing is delaying this whole process. Well, it's ensuring that the agency does the risk evaluations consistent with Congress's requirements in the first instance. It would delay it more to allow EPA to finish all of these unlawful risk evaluations, then challenge them, then force the agency to go back to the drawing board and redo all of them because they do not comply with the statutory requirements for how EPA is supposed to conduct these risk evaluations. And that's because the framework rules permit the agency to do all kinds of narrowing and slicing and dicing that is not permitted by the statute. And those questions are ripe for review now because petitioners have shown the constitutional minimum to for standing in this case. And especially relevant is the fact that Congress authorized immediate review of these rules. Counsel, what is your interpretation of the habeas corpus resource center case? Our case is different from that case in at least two important ways. First, in that case, there was not the express authorization from Congress for immediate review, which is present here. And second, in that case, the court found that there was no direct evidence of how those rules would affect the interests of any of the petitioners who were lawyer organizations. But there was no evidence about how any particular client would have their rights changed. And it was uncertain whether any state would apply for this fast track certification here. None of those uncertainties or speculative outcomes are present. It is certain that EPA is going to do these risk evaluations. It is going to follow its unlawful rules. We do have petitioners that are directly harmed by exposure to chemicals that are currently under evaluation, specifically from the kinds of uses that EPA is ignoring. So there is much stronger direct evidence of the material risk to our concrete interests. Do you think that the habeas corpus resource center case was talking about prudential ripeness or constitutional ripeness? My understanding is that the court was applying the prudential ripeness test, which looks at whether the questions are legal, whether there's hardship to the parties. That test is discretionary in this circuit. And the court has found, and this is in the Bishop Paioti tribe case, that when petitioners meet the constitutional minimum requirements for standing, the injury in fact, and especially where Congress has authorized review, that it's appropriate for the court to exercise jurisdiction right then, now, without applying the further prudential ripeness test. Petitioners meet that test in any event. What do we do with the case law that says that when Congress authorizes immediate review, that gets rid of prudential standing on the one hand, and then Spokio on the other hand, which seems to now be saying that it doesn't always matter whether Congress has authorized a judicial review process. It seems like those cases were earlier than Spokio, and I'm wondering to what extent they're still good. So I think Spokio helped define or clarify what it means to meet the constitutional injury in fact requirements, and specifically what it means to have a concrete injury. But once a petitioner shows that you have that concrete injury in fact, then that is sufficient for Article III standing. So I think that would still, that can be jived with those other cases that say once you have the constitutional minimum for standing, then the court can move forward. So I think they're consistent with each other. Part of what Habeas Corpus Resource Center said was there isn't really an injury yet because these are just regulations to guide the agency, which is analogous to some extent to what we have here. There are some parallels, and these are procedural rules. But again, we have met the test from this court in the Spokio remand case. We have alleged statutory violations. These rules violate the statute, and we've connected those statutory violations to a material risk of harm to our concrete interest in avoiding exposure to harmful chemicals. I think the connection and the evidence is much stronger than what the court found in the Habeas case. If the court has no further questions on the jurisdiction, I'd like to turn to the merits. EPA's exclusion of legacy activities. So just to take a step back, for this issue, EPA is saying there are certain kinds of activities that don't fall within the statutory conditions of use definition, and therefore we can ignore them. We don't have to look at them. That is contrary to the plain text of that definition, and it also makes very little sense and will result in EPA failing to look at significant sources of exposure from ongoing uses and ongoing disposals of chemicals. EPA has effectively turned the or in the statutory definition into an and. Conditions of use means the intended, known, and reasonably foreseen manufacture, distribution, processing, use, or disposal of the chemical. Use or disposal count on their own. It doesn't, they don't also require the chemical to have to be manufactured. It's not an and. And so EPA's assertion that insulation of asbestos in a building is not use just because that chemical is not being manufactured for that use is contrary to the plain meaning of the statute. If I may suggest, you seem to be racing by reasonably foreseen to be manufactured, processed, or distributed in commerce. Aren't we talking about infraturo? Yes, so the activities that EPA is excluding are known and reasonably foreseen uses and disposals of the chemical. So, for example, lead pipes are known to be used to bring water to homes, and it's reasonably foreseen that they'll continue to be used to bring water into homes. Yes, but these regulations, when they are eventually promulgated, will speak to the installation of lead pipe in the future. Presumably it could never order existing lead pipe to be removed, and probably that same rule would apply to asbestos, would it not? So I think that's not quite correct. EPA actually has a broad array of tools that it can use to address in situ uses of chemicals, chemicals in place, and EPA's assertion But we're talking with respect to this statute, this amended, the amendments to the statute. Yes, EPA continues to have a broad authority to address all the kinds of so-called legacy activities that EPA claims it can't do anything about. Associated disposal, for example, that is future disposal of chemicals. So it's taking asbestos debris from a building and transporting it somewhere to dispose of it. That is future commercial disposal, and under Section 2605A, it clearly says that EPA can regulate that any manner or method of commercial disposal. Same thing for what EPA calls legacy use, in situ uses of chemicals. In fact, EPA has already used its authority under TSCA, Section 2605A, to regulate in situ uses of, for example again, asbestos in buildings. And it has issued regulations imposing all kinds of requirements to try to reduce people's risks from those uses. For example, requiring notices, or when workers work with the material, wearing protective equipment, or using certain kinds of processes to reduce risks. So it's just not accurate to suggest that EPA doesn't have the regulatory tools to address these legacy uses. Could you speak to the provision that talks about aggregate or sentinel exposures and what you think it means? Yes. So the question of aggregate versus sentinel is about a technical methodology for how to measure how much of the chemical is getting into the body. And there's different ways that EPA can do that. And that's a separate issue from the first question of what are the circumstances that EPA is going to consider. That is the conditions of use question. That's before their court. But I think, in addition to saying, I know you have an argument, they have to consider all the conditions of use. But then I think you also have an argument that the risks have to be aggregated. And on the question of whether all the risks have to be aggregated, although that seems intuitive, I don't know what to do about this sentinel exposure issue. So what we are saying is that EPA has to consider all uses in combination. So, and there's a way in which the term aggregate, as understood colloquially, yes, the EPA has to integrate information about the conditions of use and hazards to figure out the contribution from any of the uses to the total risk. That is different from what's called an aggregate exposure assessment, which is a term of art and it has a very specific meaning, again, for how EPA is measuring how much of the stuff is getting into the body. And the regulations defining aggregate exposure, it talks about different, combining all of the roots and sources of exposure. So isn't that what you want them to do? I mean, isn't that what you're saying is required, this aggregate exposure approach? No, we are not suggesting that, we are not suggesting that an aggregate exposure assessment is required in every instance. EPA can consider all conditions of use using the aggregate method or using the sentinel method. There are two different questions. But once they do that for each condition of use, you want them to then aggregate them all? Well, we want them to consider the uses in combination. So a quick example, let's say there's a chemical that has two conditions of use, occupational exposures, making a children's toy, and then the children's toy itself. EPA has to look at both of those conditions of use. And then, for example, it might be appropriate when thinking about the exposure to the worker to use what's called the sentinel approach, which is the worst case scenario. Let's assume the worker is not wearing any protective equipment, and they're working 24 hours a day, seven days a week, and let's take the most conservative assumption. And that's how we're going to measure how much of the chemical goes to the worker. It is true that EPA also has to consider the children's toy and the potential risks from that toy. But again, it can do that consistent with these technical exposure methods. So they're different questions. But I thought you were arguing, maybe I misunderstood. I mean, say the worker is a mom and goes home and plays with the toy with the kid. Aren't you saying that they have to add those together? Yes, they have to consider the contribution to the total risk. And that is, to my understanding, consistent with using either the aggregate or sentinel method. I see I only have about a minute left. I'd like to reserve the remainder for rebuttal if there's no further questions. I'll give you a few extra minutes, too. Thank you. Good morning, Your Honors. May it please the Court, my name is Samara Spence. I'm here on behalf of EPA. With me at counsel's table is Laurel Celeste from EPA's Office of General Counsel, and then also joining us are counsel for interveners. Your Honor, I sort of break down the problems with petitioner's claims into two different categories. With most of their claims, petitioners aren't really challenging what the rules do or the regulations themselves. They're asking the Court to vacate hypotheticals. And this is why we argue in the briefs that there's a standing problem with the scope claim. After reviewing the habeas corpus resources case, we also think the standing problem extends to the iterative risk determination claim and the remaining information gathering claims. As a threshold question, do you concede that 2618A controls? So that is the judicial review provision that does authorize judicial review. The way we read Spokio, the Spokio case, is that that's not necessarily enough to confer standing. All of the regular standing requirements still apply. But yes, Your Honor, that provision is the provision that petitioners brought their suit under. But you're arguing that it's limited. It doesn't solve the problem. That's correct. It doesn't solve the problem. The way I read Spokio, a judicial review provision doesn't alone solve the problem. You still have the standard test for standing. You still have to have an injury that's concrete, traceable to the rule in question. So just going back, because you used some terminology and I'm not sure I remember how exactly it tracks to the provision. So as I understood it in your brief, you only argued that the preamble issues were not ripe. But now, what things are you saying there's lack of jurisdiction over? Right. So let me just break them down. There's claim one, which is the definitional interpretation of conditions of use. That's the legacy issue. That one, we think it's a close case on ripeness. But as you mentioned, Judge Freeland, we do think it's a little bit different than the others. Claim two is the question about may EPA exclude things that are conditions of use from a scope document. That one, it's hypothetical in this rule. And I'm happy to go into that in more detail. Claim three is the question about may EPA issue a risk determination in multiple documents. That's what I'm referring to as iterative risk determinations. And then there are a couple of information gathering claims left. Those are the ones about information that EPA plans to have before it starts the whole process. And so when we look at those together, we say, okay, what... So it sounds like you're saying two and three, what conditions can be excluded and the iterative. Now you're saying those lack jurisdiction. That's correct. What about the information gathering? Those as well, yes. You think they are now not... Even though you wanted them to be remanded, you're no longer asking? So there's two categories of those claims. There's the ones we requested to remand. There's two remaining that are at issue. Those, we're not contesting standing on those. We still request remand. So all the ones you requested remand, you still want remand? Yes. And then the two that are left, those we think that it is really a challenge to a hypothetical scenario of EPA, you know, perhaps in some future rulemaking, making an arbitrary and capricious decision or a decision that's otherwise contrary to statute. There's nothing in this rule that really does what petitioners are worried about. So the injury is very difficult to tie to something that's coming from these rules. Could you speak to the legacy issue then? Because I guess the first threshold question, at least for me, is, is it true that every chemical will be categorized? Or are some going to be out of the process entirely, from your perspective? So there's two answers to that. The first answer is what EPA has done is said that it's going to focus its initial efforts on assessing and regulating the chemicals that are still on the market. For particular uses. So if you have chemical A and... For example, is asbestos presently on the market or not? It is. It is. In other words, there are companies manufacturing asbestos today. Yes. And that would be subject to eventual regulation under this provision. Yes. Thank you. And so you might have chemical A where it's currently on the market for uses in jet engines, but it's off the market for uses in furniture, right? So what EPA would do is say, well, the use for which it's on the market, that's what we're assessing, because that's the thing we can most quickly assess and regulate. And that's where we can get the most bang for our buck on these initial rules. The second part of the question, Your Honor, I think your question was a little bit about, you know, will EPA always do this? EPA's interpretation here is under Chevron Step 2. It was an exercise of discretion. I could see them, you know, going back and taking another look, particularly after they get to all this low-hanging fruit. But this rule is about getting to that low-hanging fruit. Where can we do the most good with these rules? But how can we tell that, though? I mean, it sounds like you're saying the legacy rule is only about the first group of chemicals and we might do something different for the second group. Do we have any evidence of that? No. It is a matter of the way the law works under Chevron Step 2. What EPA's done now is to say, this is our approach, this is what we're doing. And that is the approach that EPA has said they're going to take. The interpretation in the preamble, it is something that EPA, you know, laid out thoroughly. It's reasons for why it's doing this, particularly the provisions that are available for ultimate regulation under 2605A, and, you know, the fact that there are some 80,000 chemicals on the inventory and they have to make progress and sort of figure out... I mean, given that number, are we ever going to get past the first round of this process? Yes, I believe we will get past the first round. I mean, you know, the numbers are kind of staggering, if you do the math, but the way EPA sees it, the best they can do is make progress. You know, this was a big regulatory gap before the Lautenberg Act came out. You know, there are all these other ways to regulate chemicals that are already on the market. There's disposal regulations, OSHA regulations, regulations about removal of asbestos and how you handle that. The thing that's really been the regulatory gap is the point at which things enter the market. And so that's where EPA is focusing its efforts, and EPA has said that's what it's going to do, at least for now. That's the rule they intend to use going forward. But how does EPA's decision to exclude legacy uses and associated disposals square with the definition in the statute that EPA is to consider the conditions of use? So they get there in a few ways. You know, the first part is that EPA does a risk evaluation under the conditions of use, but EPA is given discretion to decide what constitutes a condition of use, and that's right there in the statutory definition. It says the term conditions of use means the circumstances as determined by the administrator. That's a classic discretion-granting language. But in which a chemical is known or reasonably foreseen to be used or disposed, with that definition in the statute, how does EPA decide to exclude legacy uses? Well, so then that gets them to the next step, right? So there's the first question, which is discretion, which, you know, that involves some line drawing. It has to. And then what they did is they said, well, what does the statute tell me I have to do? So EPA looked at this language that says intended, known, or reasonably foreseen to be. You know, it doesn't say known to have been. It says known to be. So EPA thinks, okay, well, that's forward-looking. And so we think that's things in the future. The term use, you could conceivably construe that term to mean all sorts of things. That term could be stretched pretty far, but it's not necessarily that broad. And then EPA says, okay, well, what am I supposed to do under this act? What does the Lautenberg Act tell me to do? It's a triage program, right? There's 80,000 chemicals on the market. They're supposed to get started with the worst ones, the ones where they can regulate at that point where there's a regulatory gap. And then EPA looks at what its regulatory tools are. The strongest tools EPA has is a ban. You ban it at the manufacturer side. You can't ban something that's already been taken off the market. Most of those tools are geared towards regulating the manufacturer, processor, or distributor. That's a pretty strong tool EPA has. Petitioners refer to these other two tools that are a little bit more vague that say, EPA can regulate commercial use or disposal for commercial purposes. That's true, and there may be novel ways to interpret those terms, but it's not the strongest tools EPA has. And there are certainly things in the legacy category that EPA cannot reach. EPA cannot send the EPA police out to your house and make you remove a couch that has an offending flame retardant. That's just not something EPA can do under these rules. And so what EPA did was they looked at this and said, well, where can I do the most good? Where can I get the most bang for my buck? This is a new program. They're trying to make progress. And on top of that, there's the statutory timelines. Congress said EPA has to go through this process quickly. There's nine to 12 months to prioritize a chemical. That includes identifying all of its conditions of use, the hazards, the exposure potential. Then it moves into risk evaluation. It's three years, which might sound like a lot of time until you really consider what it involves. Is there any tolling during this time, for example, during the pendency of this litigation? The process is ongoing, and they are moving as quickly as they can. There's a lot going on right now. So there's no stay in effect right now or anything like that? No, Your Honor. Right now there's a risk management rule, an OMB review. There are 40 chemicals that are being prioritized right now. There's 10 under risk evaluation. And that number is going to increase as this prioritization process goes on. No, they're moving. And what is your position about whether we can look at the decisions that have already been made in applying these framework rules to understand what the framework rules mean? So basically opposing counsel urged us to look at the appendix and see how these have been used so that we can then go back and help with our interpretation of what is really happening here. Just to get some clarification, I'm wondering if this question is about the scope claim in the standing question, or is this about the legacy question? To me, exactly what you're going to do with what's excluded and also really the iterative issue are somewhat unclear, but we might be able to clarify it by looking at what's actually happened. And so they're saying look at the appendix to see what's actually happened. So I'm wondering, I guess the first question is, do you agree we can look at the appendix to see what's actually happened in this case? So in order to get at the merits, no, that's not part of the record. In order to answer the standing question, in theory, yes, but it doesn't answer the question. So as to the scope claim, there are risk evaluations going on right now. EPA has issued a number of scope documents. What we don't have in this record, or anything tied to this rule, is would there be any injury from that? Petitioners filed some 500 pages of standing declarations, and if you kind of go through these, you see that different parties are exposed to different chemicals and have different concerns. So let's say in the future, the 1,4-dioxane example came up. I believe that's the one where it appears in some instances as a byproduct. And so this isn't part of this record, but if it appears as a byproduct, the question would be, well, do you review it with the chemical, or do you review it with the thing it's a byproduct of? You could do that in one of two ways. It's not actually clear from this record, or definitely not from this rule, whether there could be any injury from that. Perhaps it's already been evaluated by the time EPA gets to it, in which case how could there be an informational injury? Perhaps EPA knows enough by the time it gets to the scope document that there really is no question about what's being excluded. You have to remember, the scope document comes out about 12 to 15 months after EPA starts the process. At this point, if there's anything excluded, it would really be a record issue as to whether there could be any harm from it. It would depend on what EPA did. So it's not that... But so they're arguing that you're going to exclude entire conditions of use, which it sounds like you think you can, because you said that's discretionary. So will the appendix tell us whether you actually are excluding conditions of use that are putting their clients at risk because they're exposed to the chemical through those conditions of use? I think all those things could do is give clues that would be incomplete and uncertain. I mean, those risk evaluations are not final. We don't know what that full record is going to say. It is true that in the 1,4-dioxane example, EPA decided to treat the byproduct a particular way in the scope document. But that's not a final document. It's not a final reviewable order. We don't know at this time what that final risk evaluation is going to say. When would it be reviewable? So the way the statute is set up is it's sort of... We had this flow chart in the brief. It's sort of every time there's an off-ramp, that's when it's reviewable. So if EPA decides something is low priority, that's reviewable. If EPA decides there's no unreasonable risk, that's reviewable. And then if EPA finds that there is an unreasonable risk and ultimately regulates, then that document is reviewable. So to the extent that these framework rules set up a system that will inform the individual determinations that are later reviewable, will the framework rule aspects of it be reviewable later, or do they only have the 60 days now? So that question sort of depends on what we're talking about. If what we're talking about is... Say later you have an evaluation of asbestos and a bunch of legacy uses are not included. Are they going to be able to challenge then the idea that legacy uses are excludable? I'm not sure I know the answer to that question, but we do think that the legacy issue is reviewable now because the interpretation is in the preamble. And they really are different. One is saying, here's what we're doing, we are excluding these going forward. In the scope issue, EPA is saying, yes, we interpreted our authority, but we haven't done it yet. We don't know exactly how that's going to play out. We don't know what types of things that would happen with. We don't know yet. It's the same thing with the one risk determination versus two risk determinations. Yes, EPA has interpreted its authority, but we don't know what that will look like when and if EPA ever does it. Actually, that leads me to a point. Your Honor asked a question about the aggregate versus sentinel question. I would like to help clarify that issue a little bit. What aggregate exposure assessment means is, let's say, a chemical is used in lots of products in the home. Maybe it's used in toys and pacifiers and carpet. One way to do it would be you look at all those exposures and you add them up together and say that's the aggregate risk. The other way to do it, what sentinel means, is you say, well, the worst risk would come from the pacifier, because it goes in the mouth. So you use that as a proxy for everything else. What I think petitioners are saying is that you say, what is the risk, and then you add those together. We're having trouble even understanding what that could mean, because there is no risk without exposure. I think an alternate example would be, what if you have a chemical that's used in manufacturing of electric fireplaces, and it's also used in manufacturing of commercial aircraft? Those would be two very different uses. Would it really make sense to add those exposures together? Maybe not. You don't have to add exposures together if a person is going to be in the various contexts, right? If they're a kid with the pacifier and then they're the kid who eats the fruit that has that chemical in the pesticide and whatever, if the chemical is used in a variety of ways, shouldn't you add them up? Well, you might, or you could use the sentinel approach, which is you look at the worst one and you use that as a proxy. But if the worst one is the pacifier, but once you add the pesticides and the exposure from the air conditioning at school or whatever, the kid's going to get cancer. I mean, doesn't it matter if there are the other uses that are going to add to it and actually tip you over some medical threshold that the pacifier itself wouldn't? I don't understand how this is possible that that's what it means. So what we understand Congress to have done is to say that EPA gets to choose one of these approaches, which one's more appropriate. That would be a record, could be a record review issue is did EPA, you know, provide a rational basis for the one it chose and did it do it properly? And did it really capture what EPA says it's capturing? But are you saying that we can't ask that now? I mean, it is your position. We can't ask that now. We have to ask it as to each chemical later. I guess I guess because because what we know is Congress gave EPA the choice. That's plain in the statute. And, you know, there's nothing about the possibility that EPA might find a reason to issue risk determinations and two separate documents at some point in time that really tells us about whether that might be a reasonable decision or not a reasonable decision that would really be a record specific issue. I mean, that's what makes these claims so hard to to even really talk about. They're all what ifs. That's why there's a standing problem. These are all what ifs. What if maybe in the future EPA exercises that authority in an arbitrary and capricious way. If that ever happens, that's reviewable. At this point in time, there's nothing in the statute that says EPA can't do that. There's nothing in the statute that says there's a procedural right for the creation of a procedural right that you only get one risk determination for the whole chemical. There might be a good reason for there to be two separate documents. I think we've taken you over your time. We better give time to the interveners. Thank you. Good morning, Your Honors. And may it please the Court. Peter Kisler on behalf of the interveners. I'd like to begin, if I may, with the jurisdictional arguments and in particular, Judge Friedland, in the course of that, to address your questions about whether there's a difference on the legacy claim and how you deal with the aggregate issues that Your Honor just mentioned. We don't think petitioners can establish standing or ripeness at this stage of the agency proceedings for any of their conditions of use arguments. And there are two key points in that regard. The first is, as both the Supreme Court and this Court have emphasized, when the challenger to an agency rule is not itself the one being regulated, but where its claim of injury is that someone else should be regulated more, standing and ripeness are not necessarily precluded, but it is ordinarily, quote, substantially more difficult to establish it. And in the habeas corpus resource center case, a specific application of that principle is very applicable here, which is the Court said that when you have a pre-enforcement challenge to agency framework rules that are going to be applied in future proceedings, that are going to be subject to judicial review, then that is only right when the entity challenging it is one of those entities whose conduct is itself being regulated and that entity is facing a choice between immediate compliance or paying penalties. That's not the case here, quite plainly. But do you think that was a prudential ripeness inquiry? Because it seems, I mean, the Forest Service case actually carves out Tosca, right? So I don't know where we are with this. It was very clear in the habeas resource center case on page 1244. The Court said that both the standing and ripeness discussions were article three, standing and ripeness. So that was a constitutional ripeness decision. And what's critical here is that all of the injuries that plaintiffs assert can only play themselves out in the context of individual chemical proceedings, each of which will be subject to judicial review, and each of which will establish a record that the Court can look at what has the agency done or not done and how are petitioners injured or not injured by that specific action or inaction. So with respect then to the legacy issue, Your Honor, it is true that EPA has reached a more crystallized and definitive legal interpretation in the framework rules on that than on some of these other issues. But that itself does not establish ripeness by itself. In habeas corpus resource center, one of the issues that was unripe was the pure legal issue that the district court had resolved against the government on summary judgment of would these certification proceedings that were coming up, would they be rules or orders, and would rulemaking procedures apply to them or not. District court said, no, they're not rules, they're orders. That was a crystalline legal question that was pure and presented, but the court nonetheless held that it was unripe because the party challenging it would have the opportunity to challenge it when it was applied in a more concrete context. And there will be information that will be fleshed out in the chemical proceedings that will shed light on how even the legacy issue is applied. So it sounds like you and EPA disagree on whether we can review the legacy issue now. That's correct. But I would also say that I can give you a definitive answer to the question that EPA did not give a definitive answer on, which is, of course, we think that would be reviewable, the legacy issue, in the context of an impermissibly excluded a legacy use that it should be included. So what happens with the requirement that these framework rules be challenged within 60 days? It's not a requirement. The same provision that says that there's a 60-day time limit to challenge these also gives 60-day time limits for all of these subsequent determinations. It's any rule. That's right. That's right. And the statute very specifically provides opportunities when a chemical is designated low priority, when it's found no unreasonable risk, or when there's a regulation. So it's the same provision. So the question in each of those instances will be, is this the instance where on this record with these petitioners there's standing and ripeness? And the reason I say, Your Honor, that even on the legacy uses there will be differences when the proceedings come out is on ER5, which is the preamble to the risk evaluation. EPA was very specific. It said even though it doesn't consider legacy uses conditions of use, it nonetheless says that said, in a particular risk evaluation, EPA may consider background exposures from legacy use, associated disposal, and legacy disposal as part of an assessment of aggregate exposure. So to the extent petitioners are saying we're deprived of information because legacy uses are off the table, the question of whether there will be standing can only really be decided in a particular chemical context. And that's true, of course, in spades with respect to the other issue about whether there's discretion at all. And in that respect, you know, I would recommend to Your Honor's ER184, which was the EPA's response to comments, which they specifically said we are not categorizing legacy uses as part of an assessment of aggregate exposure. We are categorically refusing to look at even de minimis uses. The question will be in a particular proceeding, is there reason to believe that a de minimis use will cause harm? And so, Judge Freeland, with respect to your question about aggregate, yes, EPA can decide whether to look at things aggregate or individually, but whatever it does, it's going to be subject to an arbitrary and capricious review. So if you have a situation where there are three conditions of use, and in the aggregate they're going to cause health problems, and that record is established, I think there'd be a pretty strong arbitrary and capricious challenge if the EPA just considered one, just considered the other, just considered the third, and said in isolation there is no harm. So if some of them are legacy uses, though, will they even be in the record at that point? Well, petitioners can make a record that this legacy use is important. It can then challenge the exclusion of the legacy use in the context of the individual proceeding, assuming it shows that it were injured by that particular chemical exposure, and the challenge can proceed. And that's in some ways just like the Ohio forestry case that the court in Habeas Corpus Resource Center relied on. There was a plan which was going to influence individual permitting decisions, but Justice Breyer, for a unanimous court, said that's not good enough, and when petitioners said, but it will be more effort for us to have to challenge the individual permitting decisions, Justice Breyer said two things. He said — But the courts distinguish this statute, so it's a little weird for us to ignore that, isn't it? What do we do with that? Well, but the court didn't have this particular context before it. It certainly didn't have before it what your honors do with respect to specific framework rules and claims that all relate to the individual. And that's precisely the indication that it's those proceedings in which these injuries, if they exist, will arise and should be adjudicated. Can I — you're running out of time. I have one more question about the information provisions. So the EPA wants remand on some provisions. Do you think we have jurisdiction to give them that? I think so, because, you know, first of all, that's why I said at the beginning that it's conditions of use that I thought there was no standing in jurisdiction. You could argue that to the extent there's a question about whether we are subject to scientific standards in what we submit to the  I think that's what the concerns petitioners have. We think it makes sense for the court just to send that back to the — They need our permission for that? I'm a little confused. If you dismiss the entire petition for review, the fact that they have said they believe they need to rewrite that rule to address certain concerns, they could just open their own proceeding anyway. So it doesn't depend upon the remand, but for precisely that reason, we also don't object to the remand. And, you know, we want them — look, I mean, the concern about the rule is that we won't submit something that should be submitted. We want to submit — Well, that one we all agree. Rare unanimity at that point. EPA, petitioners, and we all agree none of us should go to prison for making an incomplete submission. So that one they should certainly correct. Thank you, counsel. I'd like to address a couple points that have come up. First, I'd like to explain how this legacy issue is going to play out in the asbestos situation. EPA is currently regulating — or evaluating the chemical substance asbestos, and it's asking the question, does this chemical present an unreasonable risk to the public, including vulnerable groups like workers? In that evaluation, pursuant to its final action about what counts as a condition of use, it is going to ignore ongoing uses and disposals of that chemical. So when firefighters go into a building and there's asbestos and they might be exposed, EPA is going to ignore it. When waste haulers take that material to a waste facility, EPA is going to ignore it. Those present significant risk to the public, and under the plain language of the definition, those count. And so you're worried that they should be using those because it affects how they aggregate with something else, it tips the balance on the other thing? Or is your argument that really they have more tools in their toolbox than they say they do? Because they're saying we can't do anything about the legacy uses, so why talk about them? Where's the difference here? I think both things are true. It is true that those ongoing uses and disposals of asbestos contribute to the total risk posed by the chemical and might affect the tipping point between a reasonable and an unreasonable risk from the chemical asbestos. It is also true that EPA has lots of tools to address these ongoing uses, and just because it might not have perfect tools to address something at the margins doesn't mean it shouldn't use the tools that it does have to reduce real risk to public health. So, like, what could EPA do about the firefighters going into the building? It could require certain kinds of protective equipment be worn. It could require certain kinds of air monitoring or that certain hoses or equipment, work practice types of requirements. Does EPA have jurisdiction over the firefighters? Well, it has tools that it could use to regulate disposal and use, and it also, through Section 2608 of TSCA... Yeah, but those regulations would deal with the owners of the building or the manufacturers. I don't understand how it gets to a requirement that firefighters have to wear a certain equipment. So the task that Congress gave EPA is to evaluate the full chemical, all of the risks, figure out what are the unreasonable risks to public health, and then, at the risk management stage, figure out the most appropriate way to deal with that. And if EPA determines that a different agency or a different statute that it administers is the most appropriate tool, then that's what TSCA Section 2608 directs, is that EPA should talk to that other agency, talk to OSHA, and figure out how to regulate or address and minimize those risks. But that's not a legitimate excuse for completely ignoring them as part of the central command in this statute, which is to evaluate whether the chemical substance presents an unreasonable risk under the conditions of use. I'd like to also briefly address EPA's discussion of the pick-and-choose claim and the 1,4-dioxane example. These cases are not all about what-ifs. EPA has said it has authority, it thinks it has authority under this statute to ignore certain things that even EPA says, yes, byproducts of 1,4-dioxane, which is a likely carcinogen, count as a condition of use, but we, the agency, think we have authority under this statute to ignore it. That is not a what-if. EPA has answered that question. They've said yes. And they've already started implementing this, and for purposes of standing, at minimum, the court can look at the extra record evidence. And that's in the case Northwest Environmental Defense Center at 117F3-1520, that the court can look at those documents. Whether a chemical is present intentionally in the product or just by accident as a byproduct has nothing to do with how much risk that use presents. And so we're not just talking in this case about things on the edges or what's de minimis. EPA's rules allow it to exclude any condition of use for any reason, regardless of what the significance of that risk to the public is. And the example of 1-dioxane is a perfect example about why that is unreasonable and contrary to the central directive in the statute, which is to evaluate whether the chemical substance presents an unreasonable risk under the conditions of use. One additional point. EPA has talked about the statute as a triage process, and we need to get through all thousands of chemicals on the list. Risk evaluations under TSCA are not an exercise in triage. Congress carefully set up a multi-step process to systematically evaluate chemicals. And there's a first step in that process, prioritization. And that's when EPA decides which chemicals should go first. And there's considerations. How toxic is it? How persistent in the environment? After a chemical is selected as high priority, Congress said, evaluate that chemical comprehensively to determine whether it poses an unreasonable risk, not slice and dice and narrow the risk evaluation in ways that pose serious risk to public health. Thank you. Thank you to all counsel for the very helpful arguments in this very difficult case. The case is submitted and we're adjourned for the day.
judges: O'scannlain, Friedland, Pauleyiii